On Remand from the Alabama Supreme Court

WELCH, Judge.
Xavier Jett was convicted of attempted murder, a violation of §§ 13A-6-2 and 13A-4-2, Ala.Code 1975, and discharging a firearm into an occupied vehicle, a violation of § 13A-11-61, Ala.Code 1975. The trial court sentenced Jett to life imprisonment for each offense, the sentences to be served concurrently.
The evidence elicited at trial tended to show the following. On July 30, 2004, LaNorris Woods parked his car in the middle of the street in front of his house on Beech Avenue in Birmingham, where he intended to quickly pick up his girlfriend and their daughter to take a trip to Huntsville. As he drove up to his house, Woods noticed a white sport utility vehicle (“SUV”) doing “circles” on his street. (R. 54.)
While Woods was in the house getting his girlfriend, he saw the SUV and heard it blow its horn. Woods knew that his car was blocking the street, so he ran out to move it so the SUV could get by. As he drove his vehicle toward the SUV, Woods said, he saw Jett get out of the front passenger seat and shoot him. He said he could not identify the driver.
As Jett was shooting at him, Woods attempted to drive away, but he ran the car off the road and into the woods. Woods was able to get out of his car and go back to his house, where he asked his girlfriend to call the police and an ambulance. His girlfriend was apparently'unable to place the calls with her telephone, so Woods went to a neighbor for help. The neighbor, Kenneth May, testified that he witnessed the shooting, but he did not say (nor was he asked) whether he saw the shooter. He said he “hit the ground” when the shooting started. (R. 104.) When the shooting stopped, he said, the SUV “just took off real fast,” and he did not see anything else until he saw Woods walking toward his house. (R. 104.) May called emergency 911 and then stayed with Woods until paramedics arrived.
Woods was transported by ambulance to the hospital, where he was admitted for treatment for gunshot wounds to his arms, back, neck, and shoulder.
Woods identified Jett as the person who shot him. Woods testified that he and Jett had been friends until a friend of Woods’s younger brother was shot and killed. Woods testified that he thought Jett and another man had killed his brother’s friend.[1]
The State elicited testimony from Woods that he had been convicted of shooting Jett after the shooting of Woods’s brother’s friend. Woods explained that when he was released from the hospital after being treated for his wounds, the police asked him to come to the police station. At that time, he identified Jett as the person who shot him. At the same time, police arrested Woods for the previous shooting of Jett.
On appeal, Jett contends that the trial court abused its discretion in denying his motion for a new trial based upon newly discovered evidence.
“ ‘ “The appellate courts look with disfavor on motions for new trials based on newly discovered evidence and the decision of the trial court will *649 not be disturbed absent abuse of discretion.” Further, “this court will indulge every presumption in favor of the correctness” of the trial judge’s decision. The trial court is in the best position to determine the credibility of the new evidence.’ ”
Ex parte Heaton, 542 So.2d 931, 933 (Ala.1989), quoting Isom v. State, 497 So.2d 208, 212 (Ala.Crim.App.1986).
“ ‘To establish a right to a new trial based on newly discovered evidence, the [appellant] must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. While all five requirements ordinarily must be met, the law has recognized that in certain exceptional circumstances, even if the newly discovered evidence is cumulative or impeaching, if it appears probable from looking at the entire case that the new evidence would change the result, then a new trial should be granted. This Court in Slaughter v. State, 237 Ala. 26, 185 So. 373 (1938), recognized the exception as follows:
“ ‘ “The authorities generally recognize the rule that ordinarily such impeaching or contradicting testimony does not suffice for a new trial, though there are exceptional instances where such proffered proof may justify a reconsideration of the cause.”
‘“Id., 237 Ala. at 27, 185 So. at 373 (emphasis added). Those exceptional circumstances subsequently were defined by this Court in Maund v. State, 254 Ala. 452, 48 So.2d 553 (1950).
“ ‘ “[T]he overruling of a motion for a new trial based upon newly discovered evidence tending only to discredit the State’s witnesses is not error unless upon the whole case it appears probable that the new evidence would change the result.”
“ ‘Id., 254 Ala. at 462, 48 So.2d at 562 (citations omitted) (emphasis added).
“ ‘We recognize the existence of recent caselaw that seems to reject the exception for newly discovered cumulative or impeaching evidence that would probably change the result of a trial. See, e.g., Isom v. State, 497 So.2d 208 (Ala.Crim.App.1986); Baker v. State, 477 So.2d 496 (Ala.Crim.App. 1985); and Bland v. State, 390 So.2d 1098 (Ala.Crim.App.1980). Those cases seem to hold that cumulative or impeaching evidence will never establish a right to a new trial. However, it is evident that in each of those cases, the newly discovered evidence, when viewed in light of the other evidence presented at trial, most likely would not have changed the result. Therefore, a new trial under those circumstances would be unjustified. However, those cases should not be taken as precluding a new trial on the basis of newly discovered evidence simply because the new evidence is cumulative or impeaching, if that evidence would probably change the result if a new trial were granted.’
“(First emphasis added; some citations omitted.)”
Ex parte Layton, 911 So.2d 1052, 1055-56 (Ala.2005) (footnote omitted), quoting Heaton, 542 So.2d at 933-34.
In Story v. State, 439 So.2d 1317, 1322 (Ala.Crim.App.1983), this court quoted with approval Reynolds v. City of Birmingham, 29 Ala.App. 505, 507, 198 So. 360, 361 (1940), which held:
*650 “‘As to the insistence that the newly discovered evidence was merely impeachment of defendant’s alibi, the rule in this regard has its exceptions and such proffered proof, even though simply impeaching may justify a new trial. Slaughter v. State, supra [237 Ala. 26, 185 So. 373 (Ala.1938)]. Moreover, it has been held, and the view seems logical, that if the impeaching testimony tends to destroy or obliterate the effect of the evidence upon which the verdict rested, it is more than impeaching for that its tendency would be to defeat the verdict returned. Dennis v. State, 103 Ind. 142, 2 N.E. 349 (Ind.1885).’ ”
In this case, Jett moved for a new trial on the basis of newly discovered evidence after he learned from other inmates at the jail that Woods was claiming that he knew that another man had shot him, but that he was blaming Jett to get “leverage” against Jett in his case against Woods. (R. 291.) The trial court held a hearing on Jett’s motion, at which the following evidence was adduced.
Brandon Mitchell testified that he was related by marriage to Woods and that they were “frat brothers” in a gang called “Rude Boys.” (R. 302.) At the time of his testimony, Mitchell was being held in the Jefferson County jail on a capital murder charge. Mitchell said that while in jail, Woods “confided in him” that Jett was not the person who had shot Woods and told Mitchell the “actual” shooter’s nickname. He also said that Woods told him he had paid Marquell Savage to testify against Jett at trial.[2]
Mitchell said that Woods, whose conviction for Jett’s shooting was being appealed, told Mitchell that the reason he was blaming Jett for his shooting was that “[Woods] felt like it was leverage on this case. He felt like if he put the case on him, Mr. Jett will drop the charges on him and they’ll drop the charges on each other. Therefore, neither one of them would have a case.” (R. 305.) Mitchell said the first time he told Jett of this information was when he “got in the block” with Jett, who had already been convicted. (R. 306.)
A second inmate at the Jefferson County jail, Stanley Chatman, testified that Woods told him that Jett was not the person who shot him. Woods said he knew who had shot him and he had him “knocked off.” (R. 321.) Chatman said he also heard Woods talking to Savage “in the vent on the ninth floor in his cell,” and Woods was telling Savage to testify that Jett was the one who had shot him and that Savage had personally witnessed the shooting. (R. 321.) He said “you can hear on the vents real good.” (R. 327.) Both Chatman and another inmate testified that the vents were often used as a means of communication among the inmates at the Jefferson County jail.
Chatman said Woods told him that Jett “had put a case on him and he said he was using it for leverage in his case.” (R. 322.) Chatman said Woods told him the person who actually shot him was Damian Smith, and that he had had Smith killed. (R. 322.) Chatman said when he was put in the same cell block with Jett, he told him what Woods had said.
A third inmate, Adrian Christian, also testified that he had heard Woods tell Savage to say Jett was the shooter. Although Woods did not tell Christian who *651 the actual shooter was in his case, Woods did say that “he wasn’t going to go down by himself or something like that” and he was going to “take [Jett] down with him.” (R. 348.)
Finally, another inmate from the Jefferson County jail, Dennis Johnson, testified that Woods told him that Jett was not the person who had shot him. Johnson said Woods
“told me that a dude named Damian shot him, and he said he was going to put it on Mighty Bite [Jett’s nickname] and see if Mighty Bite will drop the case on him so he don’t have to go to court so he can get out. And he said if he dropped the case — if Mighty Bite dropped the case on him, then he’s going to drop the case on Mighty Bite.”
(R. 359.) He said that Woods did not tell him what had happened to Damian Smith.
After hearing arguments from the parties’ counsel, the trial court, without explanation, denied Jett’s motion for new trial.
In its appellate brief, the State argues that the testimony elicited from the inmates at the hearing on the motion for a new trial was merely impeachment testimony and, therefore, could not serve as the basis for a new trial. We agree that the evidence presented was impeachment testimony. However, this is one of those exceptional cases in which the impeaching testimony tends to destroy or obliterate the effect of the evidence upon which the verdict rested.
In Story v. State, supra, Story was convicted of trafficking in marijuana. At trial, evidence demonstrated that Story and her codefendant, the driver of the car, were arrested after a tote bag containing marijuana was discovered in the trunk of the car in which Story was a passenger.
The codefendant testified that he had met Story earlier in the evening and that Story had tried to sell him marijuana. He said eventually Story agreed to spend the night with him, but before getting into his car she took a bag from the trunk of her car and put it into the trunk of his car. He denied ownership of the bag. 439 So.2d at 1319. Other witnesses also testified that they had seen Story sell marijuana from the trunk of her car earlier in the evening.
After Story was convicted, she moved for a new trial based on newly discovered evidence. An undercover police officer testified at the hearing on her motion, saying that he had met Story’s codefen-dant in a separate undercover operation. The codefendant told him that the police had impounded his car and that there was some marijuana in a bag in the trunk, but he blamed it on the girl that was in his car. 439 So.2d at 1320. The codefendant also told the undercover officer that he got some of his friends to “ ‘come and testify that it was her dope and that it was in her car,’ ” and that she had needed a ride, and so the codefendant had transported the girl and her bag. 439 So.2d at 1321. The codefendant acknowledged that the marijuana was his, however. Id.
This court found that the undercover officer’s testimony not only undermined the testimony of the codefendant, but also the testimony of the other witnesses, and that, without that testimony, the State would have failed to make a prima facie case against Story, because that testimony was the only evidence linking Story to the marijuana. As a result, this court said, “ ‘we cannot say that proof of the statements would not probably change the result’ ” of the case against Story. 439 So.2d at 1321 (quoting Houston v. State, 208 Ala. 660, 660, 95 So. 145, 147 (1923)). “This is especially so in light of the apparent neutrality of [the undercover officer] and lack of motive in falsely testifying, as opposed *652 to the obvious potential bias of [the code-fendant’s] friends and acquaintances who testified against appellant. We also note the potentially great weight a jury might give an apparently neutral officer of the law.” 439 So.2d at 1321.
The trial court’s order denying Story’s motion for a new trial was reversed because this court could not say that proof of the statements made by the codefendant would not change the result of Story’s trial.
A similar situation exists in this case. A review of the record shows that the only evidence tying Jett to the crime was the testimony of Woods and Savage. Although bullet casings were found at the scene of the shooting, no weapon was ever recovered or tied to the shooting. There was no fingerprint evidence linking the bullet casings to Jett. May, Woods’s neighbor who witnessed the shooting, did not identify the shooter.
Granted, unlike in Story where an undercover officer testified as to what the codefendant had told him, the inmates who testified at the hearing on the motion for a new trial here are not upstanding citizens whose veracity cannot be doubted. But the veracity of the two witnesses who identified Jett as the shooter — Woods and Savage — is not beyond reproach either.
It is not this court’s role to judge the credibility of witnesses or to weigh evidence. The trial court did not indicate the basis for its decision to deny Jett’s motion for a new trial. We cannot determine from the record whether the credibility of the impeaching witnesses played a role in the trial court’s decision.
However, based upon the record before us, we cannot say that the evidence presented at the motion for a new trial would not probably change the outcome of Jett’s trial. Indeed, evidence that Woods knew he had been shot by someone other than Jett and had blamed Jett in an effort to get Jett to drop his case against Woods may very well lead a jury to reach the opposite result if the evidence had been known at trial.
Furthermore, the record indicates that Jett was not aware of Woods’s statements to other inmates in the Jefferson County jail until after his conviction. The record does not indicate that Jett knew, or should have known, about Woods’s belief that someone other than Jett had shot him until after the trial.
However, “[o]ne condition of the trial court’s granting a new trial on the basis of newly discovered evidence is that the court must believe the evidence presented at the hearing.” McDonald v. State, 451 So.2d 440, 442 (Ala.Crim.App. 1984).
The trial court did not state a basis for its denying Jett’s motion for a new trial. Therefore, we cannot determine whether the basis for the denial of the motion was that the newly discovered evidence constituted impeachment evidence or whether the trial court found that the evidence was simply not credible. As a result, we must remand this cause for the circuit court to clarify the basis for denying Jett’s motion for a new trial. See Farris v. State, 890 So.2d 188, 193 (Ala.Crim.App.2003).
If the trial court’s basis for denying the motion was that it found the evidence constituted impeachment evidence, that finding was error, and the court should reconsider Jett’s claim in light of this opinion. On the other hand, if the trial court’s decision was based upon its finding upon the issue of credibility, the court should make a specific finding regarding the credibility of the newly discovered evidence and determine whether the outcome of Jett’s trial would have been different if *653 jurors had been provided with that new evidence. Fanis, 890 So.2d at 193.
The trial court’s findings shall be filed with this Court within 42 days of the date _ of this opinion. The return to remand shall include the trial court’s written findings of fact and anything else the trial court believes will assist this Court in reviewing this issue.
REMANDED WITH DIRECTIONS. 
BASCHAB, P.J., concurs in the result, with opinion. McMILLAN, SHAW, and WISE, JJ., concur in the result.

. The trial court instructed the jury that the police had investigated the shooting of Woods's brother’s friend, which had been ruled a justifiable homicide, and that regardless, Jett had not been implicated in that shooting. (R. 38.)

. Savage testified that he had been at Woods's house at the time of the shooting. He said he heard gunshots and "got down” until the shooting stopped. He said that he then ran to the door, which was made of wood, opened the door, and looked outside. He said he saw "maybe three” people in a white SUV and saw Jett look back at him and point a rifle at him, so he slammed the door and got back down. (R. 152-53.)